UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| v. ) | Case No. 23-cr-00349-TJK |
| ) | |
| ISRAEL MARK MATSON ) | |
| ) | |
| ) | |
| Defendant ) | |
| ) | |

**DEFENDANT ISRAEL MATSON'S SENTENCING STATEMENT**

                                               William L. Shipley
                                               PO Box 745
                                               Kailua, Hawaii 96734
                                               Tel: (808) 228-1341
                                               Email: 808Shipleylaw@gmail.com
                                               *Attorney for Defendant*

1

I.   Introduction

Comes now Defendant Israel Matson by and through his undersigned counsel of record, William L. Shipley Esq., and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing on January 12, 2024.

Defendant Matson appears for sentencing before this Court having pled guilty to Count One of the information, charging him with a violation of 40 U.S.C. 5104(e)(2)(G) -- Parading, Demonstrating, or Picketing in a Capitol Building.

II.   Sentencing Matters

A violation of 40 U.S.C. 5104(e)(2)(G) is a Class B misdemeanor and has a maximum statutory penalty of up to 6 months in custody, and a fine of up to $5000.  The sentencing Guidelines do not apply.

III.   The Offense Conduct.

The Probation Officer has accurately set forth the relevant facts in the Presentence Report.

IV.   Sentencing Factors Under Sec. 3553(a)

Pursuant to 18 U.S.C. § 3553(a), several factors are to be considered by the Court in formulating an appropriate sentence in this case.

   1.   Nature and circumstances of the offense and the history and personal characteristics of the defendant.

      a.   The Nature and Circumstances of the Offense.

For the most part, the events of the day on January 6 are not in dispute and need not be recounted here.  As Judges in this District have recognized after studying the events of January 6 in great detail, the crowd at the Capitol

2

that day can be generally categorized as having three primary constituent parts:

1) A relatively small group of individuals who came to the Capitol for the purpose and with the intent to engage in violence with the goal of disrupting the Congress's certification of the 2020 Electoral Vote.

2) A larger number of protesters who intended to protest in a loud and raucous manner as a manifestation of their unhappiness and distrust with regard to the outcome of the election -- but with no predetermined intention of engaging in violence – some of whom were drawn into committing acts of violence once there; and

3) An even larger group who remained as spectators to what developed into a riot by members of the first two groups. Some members of this third group entered the Capitol building, walked around, and then exited without incident.

As for Defendant Matson, the offense conduct as described in the Presentence Report, and as explained in more detail below, place him squarely in the third group. But rather than simply observe events from a distance, Mr. Matson did enter the United States Capitol, but left without engaging in any violence or destruction of property while inside.

Mr. Matson flew to North Carolina to accompany with his brothers & friends to Washington DC to attend the Stop The Steal rally at the Ellipse. During the trip they sang patriotic songs and discussed politics, including what they believed were irregularities in several states with both the election process and the counting of votes. They arrived in the District of Columbia on the

evening on January 5, and the followed the sound of activity to the BLM Plaza. While they were there Ray Epps gave his now infamous speech telling the crowed they needed to "go into the Capitol!" the following day.

Mr. Matson and his group attended the January 6 rally and listened to the speech by then President Trump.  They heard discussions circulating through the crowd that "as soon as Trump is done with his speech we're meeting at the Capitol."

Mr. Matson and his party stayed for the entire Trump speech, hearing him tell the crowd near the end that they should go to the Capitol to "peacefully and patriotically" protest. Mr. Matson and his group stayed for some time after the speech ended because the crowd surging towards the Capitol had occupied all the portable latrines, and Mr. Matson and his companions were delayed in starting their walk to the Capitol while they waited in line.  But some in Mr. Matson's group were anxious to go so they split up at that point, with Mr. Matson waiting behind with one friend while his brothers followed the crowd towards the Capitol.  Once done, Mr. Matson and his friend were on their way and attempted to catch up and find his brothers.

As Mr. Matson approached the Capitol he could see the chaos that was taking place near the west side of the building.  Mr. Matson continued forward out of concern for this brothers, not knowing where they were in the very large crowd.  Mr. Matson was unable to locate his brothers walking through the crowd on the west side, but he did see that people had climbed up scaffolding to an elevated position, and he decided that that elevated position would give him a better vantage point in trying to find them in the crowd.  Being an expert

4

rock climber, taking on the task of climbing the scaffolding was a very simple task.

Once he reached the elevated position he watched as protestors engaged in scuffles with the police who blocked access to the back side of the main police line. Mr. Matson did not go to the Capitol to engage in unlawful activity nor to confront police. But what he saw and the circumstances of the events taking place all around him were such that he was adrenalized by the situation. His continued need to find his brothers, and his curiosity about what was happening closer to the Capitol building took over judgment.

Mr. Matson avoided the areas where he saw police and protesters engaged in violence and ended up at what he would describe as the main porch. Not being familiar with the Capitol, he doesn't know how else to describe it. When he arrived he observed a line of police officers leaving the area in a line, and at the same time some protestors came out of the building through a set of doors up on the porch.

Mr. Matson entered through the same doors but found himself between two sets of doors. There were police officers standing inside the second set of doors, holding them open. Mr. Matson approached those doors and went through. He did so because it appeared to him that the police were holding the doors open to allow people to go inside and come back outside given that they were not blocking the entrance.

Mr. Matson is not claiming he was "invited" inside by the Officers – they did not invite him to enter. They did not do anything as he approached. If the officers had blocked him or told him to leave, Mr. Matson would have complied.

5

Once inside Mr. Matson witnessed police "fist bumping" protestors while he was trying to decide which direction to go as he joined the crowd inside. He did not know the layout of the interior of the building other than a general knowledge of the Rotunda under the Dome, and that the two Houses of Congress occupied each end of the building.

Not long after he first entered, Mr. Matson0 found himself in the "Speaker's Lobby" where a crowd was standing outside the closed double doors. While standing back some in the crowd he observed a protestor smash the small windows of the door with a fire extinguisher. That man then fled down the hallway and Mr. Matson lost sight of him. Mr. Matson moved closer to the doors and peered through the broken glass. Mr. Matson did not realize it until later, but he was in the location where protester Ashlii Babbit would be shot and killed moments later.

When Mr. Matson looked through the broken window he first observed an individual standing not far from the doors who was wearing a Texas state flag mask and was dressed like a member of Congress or a staff member. But at almost the same moment he took note of the barrel of a semi-automatic handgun that was pointed almost directly at him. Mr. Matson immediately pulled back from the broken windows and began making his way backwards towards the direction he had come as quickly as he could.

Just before exiting the Capitol Mr. Matson was asked by another individual if that person could use the bullhorn that Mr. Matson was carrying in order to make a short speech to the protesters assembled around him. As soon as he was able, Mr. Matson retrieved the bullhorn and again looked to

6

exit the building.  This is when news began circulating quickly through the crowd that someone had been shot.  Mr. Matson did not learn until later that the shooting took place at the location he was at just a couple of minutes earlier.

Mr. Matson exited the building while texting his brothers in an effort to arrange a location for them all to meet.  The eventually found each other on the grassy slope on the West side of the Capitol, and then walked back to their hotel.  Shortly thereafter they left to return home to North Carolina.

2. <u>History and Personal Characteristics</u>.

Israel Matson was born in High Point, North Carolina in 1995 and lived his entire life on the same 18 acres of hills, forest, field & stream.  He is sixth of twelve children to his parents Tracy & Kristine Matson.  He was raised in a stable family environment, where his parents taught their children right from wrong, and saw the world in black and white terms.

Mr. Matson's father had moved away from his parents' small farm in rural Washington state at the age of 17 and learned the craft of custom concrete work from Israel's grandfather.  This laid the foundation of church and hard work that Mr. Matson's parents instilled in all their children.

The work ethic taught by Mr. Matson to his children was also made part of their education.  Israel attended at a private Christian school for several years, but finished his primary education being home-schooled by his parents.  Once finished Israel realized that he enjoyed reading, writing, and doing research on subjects that interested him.  Combining that intellectual curiosity with the work ethic instilled in him, he first decided he wanted to attend law

school, with the intention to become a business transactions attorney for small family-owned businesses like the ones he had grown up around. But when finances made attending a four-year university difficult, Mr. Matson chose a less expensive alternative and attended Guilford Technical Community College where he obtained an Associate of Arts degree in General Studies, graduating at the top of his class.  He transferred to the University of North Carolina, Greensboro with a Prelaw/Political Science major.

But a life-long love for "falconry" -- the sport of hunting wild quarry with a trained bird of prey – took him on an adventure to Utah that would change his life-plan.  The time he outdoors caused him to realize that a career that would have him inside office buildings and courthouses every day wasn't that appealing to him.  While growing up he had worked during summers and after school in various jobs for his father's construction company.  In Utah, he took a job with a company in the business of collecting wild animals like racoons from fireplaces and other hiding locations in and around residential property. Mr. Maston and a female friend then made that a traveling business together, driving thousands of miles across the Western United States in a used Land Rover, going from one community to another performing the same service.  Mr. Matson would sometime film weddings, using experience he gained from filming falcons for YouTube videos.  He furthered that talent over time by taking on any kind of video project offered to him.  Coffeeshops became an "office" for him and his female friend.  Eventually that relationship resulted in their getting in in Moab, Utah under the magnificent Corona Arch.

But Mr. Matson grew tired of repairing the Land Rover everywhere they went, so they settled down with an old rental house in Ogden, Utah. At this location they were able to continue to their love of the outdoors and pursue another passion they had developed together, rock climbing. This was where Mr. Matson found himself in 2020 in the months leading up to the Nov. 2020 election.

In the 2016 election cycle, Mr. Matson was a supporter of Ted Cruz, attending rallies and persuading his friends and family to support him. Ted Cruz was the "Christian candidate" and had a proven track record of conservative policy. Mr. Matson did not believe that Donald Trump was either of those things.

Mr. Matson's father favored former President Trump. When he secured \ the nomination in 2016, and announced names of potential Supreme Court nominees, Mr. Matson shifted his support to the former President. Seeing the world in black and white terms, with an obvious distinction between right and wrong, Mr. Matson viewed Trump as the right choice for America. Mr. Matson attended the election watch party at the Governor's Mansion with then Utah Governor Pat McCrory.

Mr. Matson continued to support former President Trump through his first term in office, and was an enthusiastic supporter of him during his campaign for re-election. Mr. Matson harbored concerns about irregularities in the outcome of the election, and came to Washington D.C. with his brothers to attend the rally and be part of the protest – nothing more.

    2.    The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just

9

>punishment for the offense, to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other <u>correctional treatment in the most effective manner</u>.

This Court, as a matter of justice and equity, should treat Defendant Matson no different than numerous other misdemeanant offenders who have accepted responsibility and entered guilty pleas for entering the Capitol without authorization.

Mr. Matson engaged in no acts of violence and did not destroy any property. He did not engage with any law enforcement officers at any time and did not fail or refuse to follow directions of law enforcement when told what to do. When the events inside the Capitol turned out to be more violent that he imagined, he immediately made his way through the crowd to find an exit and did depart from the building.

Given Defendant Matson's actual conduct on January 6, the sentence of probation recommended by the Probation Officer is the appropriate response from this Court to address the nature of the nature of the criminal acts which he has admitted. The imposition of any custodial time is unnecessarily punitive, particularly in light of the potential collateral consequence that might result in the loss of employment.

At this point it is simply not practicable to catalogue the number of cases such as this where a guilty plea to one of the Class "B" misdemeanor counts has resulted in a sentence consisting of only a term of probation. Absent any aggravating factual circumstances, the approach taken by Judge McFadden to such cases seems to be the most appropriate – not imposing custodial jail time

where the defendant did not engage in aggravating conduct inside the Capitol, and has no prior criminal record. Other Judges have acknowledged that sentences of probation are appropriate in substantially similar cases, i.e., *United States v. Wiesmar*, 21-cr-00592-1, *United States v. Frankowski*, 21-cr-00592-2, *United States v. Cronin*, 21-cr- 00233. In each of case the Government asked for a term of incarceration, but the Court determined that such a sentence was not warranted by the facts and that a sentence of probation was sufficient to accomplish the Sec. 3553(a) policy goals.

The Defendants in *Wiesmar* and *Frankowski* are similar to Mr. Matson – and likely did even more than Mr. Matson while inside the Capitol. They entered the Capitol building following the crowd just as Defendant Matson, but then traveled to different locations while inside the building and spent more time inside. *Wiesemar* and *Frankowski* both entered two Senate offices and spent several minutes inside each. Similar to Mr. Matson, they caused no damage to the building nor engaged in any violence.

*Cronin* is also similarly situated to Mr. Matson as well. He entered the building, met up with his codefendants, and the group made its way towards the Senate side of the Capitol. After being in the building for a short time, *Cronin* exited the building the same route he entered. Again, like Mr. Matson, after entering Cronin spent some time traveling through the halls before exiting the building causing no damage nor engage in violence.

This case is also similar to the another case already determined by this Court -- *United States v. Snow*, 22-cr-00030-TJK. *Snow* entered the building for roughly 50 minutes. Like Mr. Matson, *Snow* caused no damage and was

11

not violent towards police. Also like Matson, after encountering several groups of police officers he left the building. The government recommended 14 days of incarceration, but this Court sentenced Mr. Snow to only 12 months of probation. Mr. Matson should receive the same sentence as the defendant in *Snow*.

In *United States v. Tyler Tew*, 22-cr00027-RMM, the defendant entered the building for approximately three minutes, causing no damage and not engaging in acts of violence. Defendant Tew plead guilty to all four counts of the information – two "A" misdemeanors and two "B" misdemeanors. The Government requested a sentence of 6-months incarceration, and the PSR submitted recommended three years of probation. But Magistrate Judge Meriweather sentenced *Tew* to only two years of probation.

In *United States v. Greene*, 21-cr-00028, District Judge Mehta sentenced the defendant to two years probation on a single count of conviction involving an "A" misdemeanor. Defendant Greene went to trial, was acquitted by a jury of the four felonies with which he was charged, but found guilty by a jury on one misdemeanor. The defendant continued to maintain his innocence even at sentencing but Judge Mehta still found the appropriate sentence to be two years of probation.

DEFENDANT'S SENTENCING RECOMMENDATION

Based on specific offense conduct here, and taking into consideration all the factors set forth by Congress in Section 3553(a), a sentence of one year of probation for Mr. Matson accomplishes the purposes of Section 3553(a) and is a sentence with respect adequately addresses the seriousness of the offense

involved, and promotes future respect for and adherence to the law not only by them but by the public at large as well.


Date: January 8, 2024                              Respectfully Submitted,

                                                   /s/ William L. Shipley
                                                   William L. Shipley
                                                   PO Box 745
                                                   Kailua, Hawaii 96734
                                                   Tel: (808) 228-1341
                                                   Email: 808Shipleylaw@gmail.com

                                                   *Attorney for Defendants*

13